Filed 11/26/25  J.G. v. Superior Court CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| J.G.,<br><br>       Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>      Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al.,<br><br>      Real Parties in Interest. | B348450<br><br>(Los Angeles County<br>Super. Ct. No. 19CCJP05248D) |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.452.)  Linda L. Sun, Judge.  Petition denied.

Los Angeles Dependency Lawyers, Inc., Law Office of Amy Einstein, Dominika Anna Campbell and Rebecca Taft for Petitioner.

No appearance for Respondent.

Office of the County Counsel, Dawyn R. Harrison, County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Real Party in Interest.

Children's Law Center and Sarah Liebowitz for Minor.

_____

J.G. (Father), the father of L.G., petitions for extraordinary relief pursuant to California Rules of Court, rule 8.452. He seeks review of an order terminating reunification services and setting a permanency planning hearing under Welfare and Institutions Code section 366.26.[1] We deny the petition.

## FACTS AND PROCEDURAL HISTORY

L.G. was born in July 2011. Her brother, J.G., Jr., was born in January 2010.

### Prior dependency cases

Since L.G.'s birth, the family has been involved in four separate dependency cases with sustained allegations. In June 2012, the juvenile court sustained a section 300 petition alleging that Father and G.B. (Mother) had a history of engaging in violent altercations in the children's presence. Father and Mother complied with court orders and dependency jurisdiction was terminated in April 2014, with the parents granted joint legal and physical custody.

A second case was initiated in 2016. In June of that year, the juvenile court sustained a section 300 petition alleging that L.G. and J.G., Jr. were subjected to ongoing incidents of domestic violence between Father and Mother, that Father drove a vehicle with the children while under the influence of alcohol, that Mother had a continuing history of methamphetamine abuse, and that Father was a current abuser of alcohol and had a criminal history of drug and

---

[1] Further statutory references are to the Welfare and Institutions Code.

2

alcohol-related convictions.  In December 2016, the court released the children to Father (who was living apart from Mother at the time) with family maintenance services.  In June 2017, jurisdiction for the children was terminated and Father was awarded sole legal and physical custody.[2]

In October 2019, another section 300 petition was sustained, relating to an incident in which Father prevented Mother and the children from leaving the home.  Father pushed L.G., causing her to fall on stairs and suffer a contusion to her knee.  In February 2021, the juvenile court terminated jurisdiction and again granted Father sole legal and physical custody.

**The present case**

The family came to the attention of the Los Angeles Department of Children and Family Services (DCFS) in the current matter in April 2023.  Law enforcement received a report that a boy and girl were crying in Father's residence.  An officer arrived at the residence and knocked on the door but did not receive a response.  J.G., Jr. yelled out of a window that Father was " 'going to get him and beat him up.' " After the officer obtained entry to the home, the children stated that Father had locked them in the bathroom.  J.G., Jr. had visible redness around his neck area and said that Father had hit him with a belt on the stomach and butt.  Father was arrested and taken into custody.

When interviewed several days later by a social worker, J.G., Jr. said that Father became angry after J.G., Jr. made comments about Father's current girlfriend.  According to J.G., Jr., Father told him to close the window, then pulled his pants off, cut them up with scissors, and said he was kicked out of the home.  Father began to " 'toss' " him

---

[2] Mother's parental rights for another child, with a different father, were terminated in January 2019 after she was arrested for identity theft and possession of a loaded gun.  She was on probation at the time, which was revoked.

around and hit him with a belt. Father also put his hands around J.G., Jr.'s neck and hit him. J.G., Jr. reported that Father had him with a belt before, and had previously thrown a broom at him, but missed. He also said that Father used to have a gun in the home but did not any longer. J.G., Jr. did not feel safe with Father. Father " 'always' " drank alcohol and sometimes used marijuana. J.G., Jr. had been staying at his maternal grandmother's house, where he did feel safe. When told that Father had been released from jail following the incident, J.G., Jr. cried and looked scared.

L.G. said she arrived home from a friend's just after the incident between Father and J.G., Jr. She did not see Father hitting J.G., Jr. on that occasion, but saw him hit J.G., Jr. with a belt two weeks prior. L.G. said that Father did not hit her with a belt and only smacked her arm, though Father's typical punishment was to take the children's phones away. L.G. stated that Father drinks alcohol when there are events and " 'that's when he scares' " her, because Father became angry when drinking. When asked whether Father had contacted her since she began staying with her maternal grandmother, L.G. appeared emotional and said that she received a text message from Father stating, " '[D]on't be coming to my house, you guys stay away.' " Father also sent a photo from an indoor camera that showed L.G. speaking with police officers.

When Father was contacted by the social worker, he said that he did not intend to hurt or scare the children and wanted to apologize to them. He stated that if the children wished to stay with the maternal grandmother at that time he would respect their choice, and that he would prefer the grandmother, the only relative who could care for the children, over foster care. A database check showed that Father and Mother had lengthy criminal histories. The detention report noted that, though the family had numerous contacts with the dependency system, Father was very active in his cases and always completed the necessary requirements to regain custody. He remained consistently

employed and provided for the children's needs as the sole custodial parent.

**Jurisdiction and disposition**

DCFS filed a section 300 petition on April 27, 2023, alleging physical abuse of J.G., Jr. by Father, as well as alcohol abuse by Father, both of which put L.G. at risk of serious physical harm. On April 28, 2023, the juvenile court ordered the children detained from Father.

When interviewed for the jurisdiction and disposition report, J.G., Jr. said that he " 'love[d]' " living at his maternal grandmother's house and that he did not feel safe with Father. He was angry with Father because Father had locked him out of his video game account. J.G., Jr. described Father as an " 'alcohol abuser,' " said that he drinks " 'all the time' " every Friday through Sunday, and said that he " 'acts scary' " when drinking. L.G. said that she previously felt safe in Father's home but that now he " 'can be really mean and aggressive.' " She said that Father drank at birthday parties or when he was " 'having a bad day,' " and that he gets " 'all crazy.' "

Father was interviewed and denied the section 300 petition's allegations, calling all of it " 'false.' " He said that he had not consumed alcohol since January of that year, and explained prior arrests by claiming that the police did not like him. When asked about the children, he said, " 'I don't know if I want to see those kids,' " but then stated, " 'I'm a good father. I'm not who you guys say I am.' "

At the June 2023 jurisdiction and disposition hearing, the juvenile court sustained the allegations against Father. The court ordered the children removed from Father's custody and granted reunification services. Father was ordered to submit to weekly drug and alcohol testing, to participate in anger management and parenting classes, and to attend individual counseling and conjoint counseling with the children, and was to receive monitored visits.

In July 2023, following a positive test for methamphetamine, a supplemental section 300 petition was filed as to Mother. The children were ordered detained from Mother.

As of September 2023, the children continued to reside with the maternal grandmother. J.G., Jr. said that he did not want to return to either Father or Mother, as he preferred living with his grandmother. He saw Mother occasionally, but she would just give him a hug and then look down at her phone. L.G. also wished to stay with the maternal grandmother rather than live with either parent. Both children told the social worker that the grandmother did " 'everything' " for them. During a recent visit with Father, J.G., Jr. and Father got into a heated argument, and both children refused conjoint therapy with him.

The maternal grandmother, when interviewed, stated that she had been the primary caregiver of the children since they were born. DCFS records showed that the grandmother had been involved with the children throughout their lives, though there were also significant periods when Father had custody of the children. The grandmother noted that Father had not recently kept some of his promised visits with the children and said that they were disappointed when he did not show up. DCFS records showed that, after Father's argument with J.G., Jr. in August 2023, L.G. refused to attend scheduled visitations in September and October 2023.

The juvenile court sustained the supplemental petition against Mother in September 2023 and ordered the children removed from her custody in October 2023.

**Six-month review period**

A status review report from April 2024 noted that the children were still living with their maternal grandmother, who continued to provide for all their basic needs. The home was clean and safe, and the grandmother fostered a supportive environment. L.G. had refused to participate in individual therapy or conjoint therapy and had refused

overnight visits with Father, though she did have a handful of day visits up until late 2023.  When asked why she refused further visits with Father, she responded, " 'I just don't want to go.' "  She also said that she wanted to continue living at her maternal grandmother's house because " 'it is better.  There is more people, I got new friends here.  I settled here and I feel [safer].  My dad would get drunk and out of hand when I was younger and shit.  I haven't talked to [or] seen him.  If I have to go back to my dad's, I am not going to listen or consider him my father.  I want to be happy like I am over here.' "

J.G., Jr. had behavioral issues and, in February 2024, he told the social worker that he wanted to live with Father, saying that he hated living at the maternal grandmother's house, though he later said that he was not sure if he was ready to return to Father's home.  J.G., Jr. sent angry text messages to Father after Father blocked J.G., Jr.'s video game account for missing Saturday school.  While most of Father's responses to J.G., Jr. were fine, a few were angry.  When questioned by the social worker, Father stated that he should have " 'left it alone' " and that he was in anger management classes and " 'working on it.' "

By March 2024, Father had completed parenting classes and was enrolled in anger management and individual counseling, and was successfully testing weekly.  He had been consistent in his visitation efforts and had overnight visits with J.G., Jr.  He continued to be employed full-time, and his parenting skills with respect to discipline had noticeably improved.  He reiterated his hope that the children would be returned to him.  Regarding the incident that led to the filing of the section 300 petition, Father said, " 'I made a mistake that won't happen again, a huge mistake.' "

DCFS observed that Father's home was safe and clean.  As of April 2024, Father had made significant progress in his case plan and had attempted to remain actively present in the children's lives.  Although an assessment tool showed a "high" risk if the children were

returned to Father, DCFS recommended that the children be released to Father with family maintenance services.

In a last minute information provided to the juvenile court in April 2024, DCFS relayed a text message from J.G., Jr. to the social worker, in which J.G., Jr. stated that Father had previously held him and his sister at gunpoint. When interviewed, J.G., Jr. said that Father pointed a gun at L.G., not at him, and that it was on " 'the night [Father] shot at [a] car.' " J.G., Jr. said that he no longer wished to live with Father, and that he would run away if returned to him. L.G. was also interviewed and she said that Father pointed a gun at her " 'a while back,' " before the case began, while he was drinking and dancing. According to L.G., J.G., Jr. was not around when Father pointed the gun. She refused to provide any further details of the incident, and instead repeated that she did not wish to be returned to Father, saying, " 'He is going to get drunk again. I'm worried going back to him for my safety.' " Father denied ever pointing a gun at either of the children and said that he did not own any weapons. DCFS continued to recommend return of the children to Father with family maintenance services.

At the six-month review hearing, held in April 2024, the juvenile court declined to return the children to either parent and continued reunification services.

**12-month review period**

In a June 2024 report, DCFS reported that J.G., Jr. had returned to living with Father. L.G., however, continued to refuse visits with Father because she was " 'mad at him.' " In a telephone call, L.G. told Father, " 'I'm not going to respect you,' " " 'I love you but going back is not what I want to do. I'm going to try my hardest not to go back. I will hate you if I have to go back. If you love me, you'll let me stay.' " In May 2024, L.G. told the social worker, " 'I don't wanna go back to dad, I don't like him or anyone in the house over there.' " She was angry with Father for taking away her video game account. Two weeks

later, L.G. said that she did not want visits with Father because she was " 'still mad about the game.' "

Father was no longer required to submit to weekly tests for drugs and alcohol, only upon suspicion of use. He had not been suspected of using substances during the period. He remained compliant with his case plan and was consistently available to visit with L.G. and engage in joint counseling, though she continued to refuse both.

DCFS received a message from the maternal grandmother, who had videotaped a phone call between Father and L.G. During the call, Father said to L.G., " 'I am really hurt by you, and that is so disgusting of that family over there, taking another man's kids.' " Father continued, " '[T]hat family over there is sick, that's really sick to try and take away my family away from here.' " When he said, " 'I am really hurt by you. I gave you no reason not to see me,' " L.G. replied, " 'Yes you did, you gave me hella reasons.' " Father asked, " 'What did I do?' " and L.G. responded, " 'You took my [video] game bruh, that's a big reason.' " Father then asked, " 'So is that a reason not to come home?' " and L.G. replied, " 'Yes, you proceeded not to give it back.' "

DCFS reported that Father now scored as a "moderate" risk on its assessment tool. Nevertheless, DCFS recommended that the juvenile court terminate his reunification services for L.G. because she did not want to see him. It also recommended termination of Mother's reunification services since she had not been compliant with her case plan.

The 12-month review hearing was held in July 2024. The juvenile court found that Father's compliance with reunification services was substantial and continued the services.

**18-month review period**

The next DCFS status review report was filed in December 2024. Father informed the social worker that he had completed his court-ordered programs. He had not been required to test for drugs or alcohol. L.G. continued to refuse most visits with Father, though she

9

did visit with him several times during the period. Both Father and L.G. reported that the visits went well. The social worker noted that Father appeared to care about L.G.'s mental health, growth, and well-being.

L.G. still wished to live with her maternal grandmother " 'through legal guardianship.' " The grandmother was in agreement with this plan. DCFS reported that she fostered a safe and supporting environment. L.G. stated that she wanted to live with her grandmother because she loves her and provides good care and emotional support. Even though L.G.'s brother, J.G., Jr. had returned to living with Father, L.G. preferred to remain with the grandmother, adding that she was surrounded by extended family members who lived in the house.

DCFS recommended that reunification services be terminated for both parents. Mother was still not compliant with her case plan and consistently missed drug tests. Although Father was complying with his plan, L.G. did not want to return to his care and DCFS expressed concerns that returning her to Father could be detrimental to her well-being.

At the initial 18-month review hearing held in January 2025, the juvenile court found that Father had made substantial progress in alleviating or mitigating the causes necessitating placement and that Mother's progress was insubstantial. The court continued the hearing to July 2025, allowing reunification services to proceed.

A further status review report, from July 2025, noted that L.G. had refused overnight visits with Father and visited him in the daytime only once since the last report. She said that she had a good time during the visit. L.G. had completed individual therapy. Her therapist noted that there were no mental health concerns at the time.

Father was responsive and communicative with DCFS and continued to express his love for L.G. and hopes that she would be returned to him. The social worker opined that Father was able to

10

provide a safe and stable environment for L.G.  His home was safe and clean, with plenty of food.  Father had completed all of his court-ordered programs, including parenting, anger management, and individual counseling.  He was unable to participate in conjoint counseling with L.G., however, because she refused the therapy sessions.

Father told the social worker that he did not spend as much time with L.G. as he wanted but understood that it was her decision not to visit.  Father wanted L.G. released to his care, with DCFS to monitor the situation, and " 'to go from there and just give me a shot.' "  Father knew that L.G. would still want to see the maternal grandmother.  He said that he would not prevent her from doing so and would transport her to and from the home.  Father stated, " 'I gave no reason for my daughter to not come home to me.  She should've been home already, I have caused no harm to her.  I want my daughter back home where she belongs with her brother and me, as a family.' "

L.G., on the other hand, said:  " 'I don't want to go back.  He's going to take me back and all I'm going to hear is that my grandma's family is trash and he is never going to let me come back.  Right now, he's sober because you guys are watching him.  Me and [J.G., Jr.] know it's going to happen all over again.  He scares us.  I shouldn't have to grow up like that.  I was a kid, I had to grow up so fast.  Sometimes I ate a can of menudo and that's all he would feed us.  I don't want to go back.  This is like our 4th case, shit pisses me off.  [J.G., Jr.] is good there but I don't want to go back and I refuse to go back even if the court makes me.' "  " 'I don't want to go back, same cycle all over again.  He can't stop.  I know my dad, I use [*sic*] to be on his side but he is not a good person.' "  " 'Look at me, I'm so healthy now, my dad would never even take me to the doctor's before unless my arm was falling off or something."  L.G. wanted her maternal grandmother to become her guardian because she wanted stability and to be out of the dependency

11

system.  L.G. believed that if she was returned to Father, he would not allow her to see her maternal grandmother.

Father was deemed a "moderate" risk on the assessment tool. DCFS recommended that L.G. be released to his care.  The report noted that, although L.G. was still unwilling to return to Father, she was mentally stable and there were no safety concerns with Father's home.

The review hearing was initially scheduled for July 28, 2025. The juvenile court continued the hearing, however, to allow counsel for L.G. to contest DCFS's recommendation of return to Father.

DCFS submitted last minute information for the court on August 14, 2025.  The report noted that, because there were no concerns with L.G.'s mental health, her individual counseling case was closed in early June 2025.  In July and August 2025, DCFS reached out again to L.G.'s therapist, requesting information on L.G.'s statements relating to Father and whether it would be detrimental to L.G.'s mental health if she were returned to Father.  DCFS did not receive a responsive answer, but instead was told that the therapy records were confidential.

The contested 18-month review hearing was held on August 21, 2025.[3]  Counsel for L.G. requested termination of reunification services for both parents.  Minor's counsel noted that Mother had a positive drug test and refused the bulk of tests.  As to Father, minor's counsel acknowledged that he had complied with reunification services.  She asserted, however, that, even if L.G. were ordered returned to Father, L.G. would not comply and would attempt to remain with her maternal grandmother, where, according to counsel, she was "thriving."  Counsel argued that L.G. had valid fears of Father given the extensive dependency history.  Counsel for Mother joined in minor's counsel's arguments.

---

[3] The hearing involved only potential termination of reunification services as to L.G., since J.G., Jr. had returned to Father.

Father's counsel submitted on the DCFS recommendation for return of L.G. to Father.  Counsel noted that the case was initiated based on allegations of physical abuse against J.G., Jr., who had since reunified with Father and whose case was closed.  Father had completed his court-ordered program well prior to the hearing and had consistently sought to visit with L.G.  Further, according to Father's counsel, there was no evidence that returning L.G. would be detrimental to her mental health.  DCFS joined in Father's arguments.

The juvenile court declined to order the return of L.G. to either parent.  The court found that Mother had not complied with reunification services, while Father had substantially complied.  Although the court recognized that the lack of visitation and participation in conjoint counseling could not be attributed to Father, the court terminated reunification services, finding that it would be detrimental to return L.G. to Father.  The court stated:  "[R]eturn will still create a substantial risk to [L.G.'s] emotional health and physical health in that she has been adamant and persistent in stating that if she returned to her father she would hate him, he will break her, she's worried for her own safety if she is sent back to her father."  The court noted that L.G. did not trust Father to remain sober and that L.G. had been subject to three prior dependency matters.  In contrast, L.G. had "been thriving under the care of her grandmother."  The court concluded by finding "a tremendous detriment to [L.G.'s] physical and emotional well-being" if returned to Father as Father had "not been able to demonstrate throughout the last 13 years that he is able to provide [L.G.] with a stable home," and that, if returned, L.G. would "suffer tremendous emotional distress."  After ordering termination of reunification services, the court set a section 366.26 hearing for both parents.

Father filed a timely notice of intent to file a writ petition challenging the juvenile court's order, and thereafter (through counsel) filed a petition for extraordinary writ, while L.G.'s counsel filed an

13

answer opposing the writ petition.  DCFS filed a letter noting that it would not oppose the writ petition, as it recommended in the juvenile court that L.G. be released to Father's home.

## DISCUSSION

Section 366.22, subdivision (a)(1) provides that at the 18-month review hearing, "the court shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."  Detriment " 'cannot mean merely that the parent in question is less than ideal . . . .  Rather, the risk of detriment must be *substantial*, such that [the proposed action] represents some danger to the child's physical or emotional well-being.' "  (*In re A.J.* (2015) 239 Cal.App.4th 154, 160.)

We review the juvenile court's finding of detriment and ensuing order denying return of L.G. to Father, terminating Father's reunification services, and setting of the section 366.26 hearing for substantial evidence.  (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705 (*Constance K.*); *Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)  "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  " 'Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.' "  (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1423.)

Father argues that the juvenile court's finding of a substantial risk of detriment was not supported by substantial evidence.  Although this matter presents a close case considering Father's admirable efforts

14

at reunification, we conclude that the juvenile court's order was supported by multiple factors. Even though each of these factors, if considered alone, may not warrant a finding of substantial detriment, when considered in their totality they constitute substantial evidence supporting the juvenile court's determination. (See *In re Luke M., supra,* 107 Cal.App.4th at p. 1425 ["A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm"].)

Proper considerations for the juvenile court at the section 366.22 hearing include: (1) "whether changing custody will be detrimental because severing a positive loving relationship with the [current caretaker] will cause serious, long-term emotional harm"; (2) "instability in terms of management of a home"; (3) "failure of [the child] to have lived with the natural parent for long periods of time"; (4) "and the manner in which the parent has conducted himself or herself in relation to a minor in the past." (*Constance K., supra,* 61 Cal.App.4th at pp. 704–705.) Additionally, although not determinative, L.G., as a 14-year-old at the time of the hearing, was entitled to have her wishes considered by the court. (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1265.)

Each of these considerations provides support for the juvenile court's detriment finding. First, as noted in DCFS reports, and as echoed by the juvenile court, the maternal grandmother fostered a supportive environment and L.G. was "thriving" under her care. Removing L.G. from that environment threatened to cause long-term emotional harm. Further, L.G. believed that Father would prevent her from seeing her grandmother, an assertion that the juvenile court relied on in finding detriment. Although Father stated that he would allow L.G. to visit her grandmother if L.G. was in his care, as the reviewing court we do not reweigh the evidence or evaluate the credibility of witnesses. (*Kevin R. v. Superior Court* (2010) 191

15

Cal.App.4th 676, 689; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

The remainder of the foregoing factors, which in this case each closely relate to the other, provide further support for the juvenile court's determination. Due to the instability of Father's home arising from his prior misconduct and the repeated necessity of dependency jurisdiction, L.G. had lived much of her life outside of his care. Although she was only 12 years old at the initiation of this case, this was the fourth proceeding in which she was declared a dependent of the juvenile court. The maternal grandmother stated that she had been the primary caregiver for L.G. since she was born, and DCFS records showed that L.G. had spent a significant amount of time in the grandmother's care and away from Father.

Moreover, as found by the juvenile court, L.G. had valid fears that Father would relapse into alcohol abuse based on her past experiences while in his care. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 424 ["past failure was predictive of the future"]; *In re Joseph B.* (1996) 42 Cal.App.4th 890, 903 [considering child's fear of future physical abuse based on past abuse].) In an earlier case from 2016, allegations were sustained that Father drove a vehicle while intoxicated with the children as occupants and that he abused alcohol. Despite the fact that Father reunified in that case, he subsequently reverted to alcohol abuse and violence toward the children, as evidenced by the sustained allegations in this matter and the children's numerous statements to DCFS. Father's alcohol abuse corresponded with his violent behavior. The children reported that he gets "scary" and acts "all crazy" when drinking, and L.G. told the social worker that Father once pointed a gun at her while drunk.

Father's thorough participation and completion of reunification services was commendable and a factor the juvenile court properly considered in making its decision. It was not determinative, however. (*Constance K., supra,* 61 Cal.App.4th at p. 705.) Instead, "the decision

16

whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*In re Joseph B., supra,* 42 Cal.App.4th at p. 899.) And in making that decision, the juvenile court could properly rely on L.G.'s statements and wishes, among other considerations. (*In re Adam H.* (2019) 43 Cal.App.5th 27, 33.)

Fundamentally, the " 'purpose of the California dependency system is to provide maximum safety and protection for dependent children, and to ensure their physical and emotional well-being.' " (*In re L.M.* (2019) 39 Cal.App.5th 898, 910; § 300.2.) The juvenile court observed that L.G. had "been adamant and persistent in stating that if she returned to her father she would hate him, he will break her, she's worried for her own safety if she is sent back to her father." The juvenile court did not err in considering the potential risks presented to L.G. if returned to Father, and we conclude that its finding of substantial risk of detriment is supported by substantial evidence.

## **DISPOSITION**

The petition for extraordinary writ is denied.  This opinion shall become final immediately upon filing.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


LUI, P. J.

We concur:


CHAVEZ, J.


RICHARDSON, J.